Opinion issued March 11, 2010














In The
Court of Appeals
For The
First District of Texas




NO. 01-09-00081-CV




KENNETH R. LYLE AND WARBONNET EXPLORATION COMPANY,
Appellants

V.

JANE GUINN REVOCABLE TRUST, PERRY B. MENKING, JR.
INVESTMENT MANAGEMENT TRUST, LYNN SAHIN, KATE LUTKEN
BRUNO GRANTOR TRUST, WESLEY LUTKEN GRANTOR TRUST,
DANIEL R. JAPHET, JR., GRETCHEN JAPHET, SUSAN JAPHET
SCOTTY, AND LARKEN JAPHET SUTHERLAND, Appellees




On Appeal from the 149th District Court
Brazoria County, Texas
Trial Court Cause No. 30776




O P I N I O N
          This case involves the interpretation of an assignment of rights to an oil and
gas lease commonly known as the Hogg-Japhet Lease. Appellants Kenneth R. Lyle
and Warbonnet Exploration Company (“Warbonnet”) appeal the trial court’s
interlocutory order granting partial summary judgment in favor of appellees, the heirs
of Dan A. Japhet, a party to the original assignment (collectively, “the Japhet heirs”). 
In seven issues, Lyle


 argues that the trial court erred in denying his motion for
summary judgment and granting the Japhet heirs’ motion for partial summary
judgment and in holding that Lyle is bound by the original assignment, that Lyle is
obligated to account to the Japhet heirs for his proportional share of their interest in
the lease, and that Lyle is obligated to pay the Japhet heirs a one-fourth net profit
royalty as referenced in the assignment. Specifically, Lyle argues that (1) the
“additional consideration provision,” which the Japhet heirs argue is an explanation
of the one-fourth royalty interest, is actually a production payment that was fully paid
and discharged prior to Lyle’s acquisition of the lease; (2) no interest was reserved
to Dan A. Japhet in the assignment; (3) the Japhet heirs “are strangers to [him], have
no title, and [he] has superior title to his leasehold interest”; (4) the Japhet heirs have
no recorded interest in the lease; (5) the Japhet heirs’ claims are barred by four-year
and two-year statutes of limitations, laches, extinguishment of interest, and payment
of all consideration; and (6) alternatively, he presented evidence that raised genuine
issues of material fact as to the proper construction of the assignment, payment, and
discharge and satisfaction, and on his defenses of extinguishment of the production
payment, laches, statute of limitations, and waiver.
          We affirm.
BACKGROUND
          Dan A. Japhet and others conveyed an oil, gas, and mineral lease (the “Hogg-Japhet Lease”) to Humble Oil & Refining Company by executing an assignment
(“1919 Assignment”). The 1919 Assignment provided an account of the passage of
title to the property in question from its original owners, Ima Hogg, Mike Hogg, Will
C. Hogg, and Tom Hogg to Dan A. Japhet with the Hoggs’ reservation of a 1/8
royalty interest. Dan A. Japhet then conveyed parts of his interest in the lease to R.S.
Coon, J.A. Williams, and T.W. Wilson. The 1919 Assignment provides, in relevant
part:
          [The lease] is owned in the following proportions, viz. Dan A.
Japhet fifty-two-sixtieths (52/60), R.S. Coon five-sixtieths (5/60), J.A.
Williams two-sixtieths (2/60) and T.W. Wilson one-sixtieth (1/60); and
. . .
 
          Now Therefore, Know All Men By These Presents: that for and
in consideration of the premises and of the agreements to be performed
by said Humble Oil & Refining Company, as hereinafter set out, and of
the payment by said [Humble Oil] to Dan A. Japhet [et al.] of the sum
of $200,000, the receipt of which is hereby acknowledged, said Dan A.
Japhet [et al.] have bargained, sold, transferred and conveyed unto
[Humble Oil] all of their right, title and interest [in the lease], subject to
the royalty interests reserved under [the original in which the Hoggs
conveyed the land] and transfers hereinbefore referred to, and to the
royalties herein reserved to assignors, and subject also to any and all of
the conditions and agreements to be performed by [Humble Oil], as
hereinafter set out. . . .
 
          TO HAVE AND TO HOLD unto the said Humble Oil & Refining
Company, its [successors] and assigns, forever.
 
          [Humble Oil], by its acceptance hereof, and in consideration of
this transfer, agrees to comply with each and every obligation of said
assignors hereafter arising or becoming incumbent upon them as sub-leasees. . . .
 
          In further consideration of this transfer [Humble Oil] further
agrees to carry [Dan A. Japhet et al.] for a working interest of one-fourth
(1/4) of the net money profit realized by it from its operations upon said
tracts of land, accountings to be had monthly once profits begin to
accrue, and no expense commonly known as over-head expense, such
as head-office superintendence, book-keeping, cost of rendering
accounts, etc. to be charged against said land or against assignors; nor
shall [Humble Oil], in computing the profits, be entitled to reimburse
itself for the cash consideration above receipted for. However, while
assignors shall in no case be called upon to repay any part of any
payments made to them under previous monthly accountings,
nevertheless at the end of each calendar month [Humble Oil] shall have
the right to carry forward the loss, if any, shown by the month’s
operations as a charge against the returns from said tract of land for the
first and succeeding months as may be necessary to reimburse it
therefor. All monies to become due hereunder to assignors shall be
payable to them by [Humble Oil] in the proportions in which assignors
own said original contract, as hereinbefore specifically set out. . . .
 
          It is further agreed that all the conditions and terms hereof shall
extend to the heirs, executors, legal representatives, successors and
assigns of the parties hereto.
 
The 1919 Assignment was executed on February 20, 1919 and recorded in the Deed
Records of Brazoria County.
          Dan A. Japhet and Humble Oil also executed a second agreement on February
20, 1919 conveying certain personal property and stored oil from Japhet to Humble
Oil. That agreement provided, in relevant part:
          WHEREAS, on the 20th day of February, 1919, Dan A. Japhet,
R.S. Coon, T.W. Wilson, and J.A. Williams . . . transferred to the
Humble Oil & Refining Company . . . certain leases owned by them[,
including the lease in question here].
 
          WHEREAS, [Dan A. Japhet et al.] have agreed to convey to
[Humble Oil] all of their right, title and interest in and to the oil in
storage and the hereinafter described personal property located on said
22 ½ acres of land, [Humble Oil] having agreed to take charge of all
operations upon said plots of land from and after February 20, 1919, at
six o’clock P.M. and further agreed to conduct all operations at its own
cost and expense, including the payment for the labor performed and
material used upon said premises, and to pay to [Dan A. Japhet et al.]
from said time their one-fourth (1/4) royalty interests accruing from
production, as specified in said transfers;
 
          NOW, THEREFORE, in consideration of the promises, the parties
hereto have agreed as follows:
 
 
First.
          In consideration of the sale to it of all of the interest of [Dan A.
Japhet et al] in and to said oil, [Humble Oil] has paid to [Dan A. Japhet
et al.] the sum of $20,000.00, the receipt of which is hereby
acknowledged. It is the understanding of the parties hereto that the
interest of [Dan A. Japhet et al.] in and to such oil is at least 26,000
barrels; this including the oil in storage upon said tracts of land and
5139.45 barrels in the storage tanks of [Humble Oil]. In this connection
it is agreed that if said oil shall not measure out as much as 26,000
barrels, [Dan A. Japhet et al.] shall refund to [Humble Oil] for any
deficit, proportionately.
 
Second.
          [Dan A. Japhet et al.], for and in consideration of the sum of
$5,000.00 to them paid, the receipt of which is hereby acknowledged,
agree to sell and transfer or cause to be transferred to [Humble Oil], a
certain drilling rig owned by the Sutherland Oil Company and situated
on said 2½ acre tract of land. As part consideration for the $50,000.00
paid to R.S. Coon and the Sutherland Oil Company under said transfer
of the contract on said 2½ acre tract, [Dan A. Japhet, et al.] hereby
convey to [Humble Oil] all of the personal property owned by them and
situated upon said 2½ acre tract of land. In part consideration of the
payment to [Dan A. Japhet et al.] of the $200,000.00 for the transfer of
the lease contract upon said twenty (20) acres of land, [Dan A. Japhet et
al.] hereby convey to [Humble Oil] all of the personal property owned
by them and situated upon said 20-acre tract of land, including a drilling
rig, boilers, tanks, pipe, horses, wagons, buggy, harness, and all tools
and machinery.
 
Third.
          It is further agreed that from and after six o’clock, P.M. February
20, 1919, all operations upon said 2 ½ and 20 acre leases, transferred to
[Humble Oil] have been and shall be conducted at the cost and expense
of [Humble Oil], and that from said time [Humble Oil] shall pay [Dan
A. Japhet et al.] for royalties accruing to them under the terms and
provisions of said transfers which are referred to and made part hereof.
 
          In 1969, Humble Oil assigned the lease to Salmon Corporation, and the
Humble Oil-Salmon assignment recited:
The above described lease is subject to the following:
 
          (a) An Agreement dated February 20, 1919, as amended, between
Humble Oil & Refining Company and Dan A. Japhet et al. It is
specifically understood that Assignee takes the property subject to said
Agreement and Assignor makes no representations as to what items
should or will be charged as expenses or taken into consideration in
determining profits under said Agreement.
 
The lease was assigned several more times, and the same “subject to” language
appeared in each of the assignments. Dan A. Japhet left his estate to his three sons,
the last of whom died in 1990.
          On November 21, 1990, Lyle purchased the portion of the “net profit interest”
in the Hogg-Japhet lease belonging to the estate of E.C. Wilson, the heir of T.W.
Wilson, who, along with Dan A. Japhet, was one of the parties to the 1919
Assignment.
          Lyle then took over as the operator of the Hogg-Japhet Lease in 1991, and
Mary Louise Hablinski assigned her interest in the lease to Lyle. That assignment
also provided:
The above described lease is subject to . . . an agreement dated February
20, 1919, as amended, between Humble Oil and Refining Company and
Dan A. Japhet, et al. It is specifically understood that Assignee makes
no representations as to what items should or will be charged as
expenses or taken into consideration in determining profits under said
Agreement.          The estate of Dan A. Japhet (“Japhet Estate”) was listed as an owner of an
interest in the Hogg-Japhet lease on the 2001-2002 Brazoria County tax rolls, and
Dan R. Japhet paid the taxes on that interest on behalf of the Estate. Subsequently,
Lyle sent the tax assessor a list of owners that excluded the Japhet Estate, resulting
in the Japhet Estate’s removal from the county tax rolls. In 2003, Dan R. Japhet
contacted Lyle regarding the Japhet heirs’ interest in the lease and demanded that
Lyle give an accounting of the interest and pay one-fourth of the net profits to them. 
Lyle refused to do so.
          On October 1, 2004, the Japhet heirs filed this lawsuit alleging causes of action
to “recover title and possession of the Reserved NPI


 and to quiet their title thereto,”
for breach of the 1919 Assignment and specific performance of its covenants, for a
declaratory judgment “concerning the existence of the Reserved NPI, the proper
calculation of the net profits, and other matters arising under the 1919 Assignment,”
and for attorney’s fees. A subsequent amended petition also added a cause of action
for breach of Lyle’s duty to pay the royalty.
          Lyle generally denied the Japhet heirs’ causes of action and asserted
affirmative defenses of statute of limitations, laches, satisfaction and accord, waiver,
and statute of frauds. Lyle also argued that he owned only 17.25% of the leasehold.
          The Japhet heirs filed their motion for partial summary judgment seeking
“judgment that they are entitled to . . . an accounting by Defendants for 52/60 of 25%
of any and all net profits from the Hogg-Japhet Lease and an order directing specific
performance of their contract with Defendants.” The Japhet heirs argued that they
were the successors in interest of Dan A. Japhet’s 52/60 of the reserved one-fourth
net profit royalty. The Japhet heirs provided an abstract of title showing the chain of
title from Dan A. Japhet to them. 
          Lyle responded to the Japhet heirs’ summary judgment motion and filed his
own motion for summary judgment arguing that the heirs did not have an interest in
the leasehold because (1) the 1/4 net profit interest was “merely additional
consideration” and not a reserved right from the leasehold and (2) their claims were
barred by the statute of limitations and laches. In response to Lyle’s motion for
summary judgment, the Japhet heirs reasserted their argument that the 1919
Assignment is a valid and enforceable contract that unambiguously reserved a net
profits interest in Dan A. Japhet, and that they, as heirs of Dan A. Japhet, are the
record owners of the reserved interest.
          The trial court granted the Japhet heirs’ motion for summary judgment in part
and denied Lyle’s motion for summary judgment. The trial court’s order specifically
stated:
2. In the 1919 Assignment, Humble agreed, in “further consideration of
this transfer” to “carry Dan A. Japhet [et al] for a working interest of one
fourth (1/4) of the net money profit realized by [Humble] from its
operations” upon the Hogg-Japhet Lease. As stipulated in the 1919
Assignment, Dan A. Japhet owned an undivided 52/60 of the carried
working interest of one fourth (1/4) of the net money profit realized
from operations on the Hogg-Japhet Lease.
 
3. The 1919 Assignment is binding on the successors and assigns of the
parties to it, subject to the terms and conditions therefor.
 
The trial court also found that the Japhet heirs are the “present-day successors in
interest to Dan A. Japhet” and the “present-day owners of said 52/60 of the carried
working interest of one fourth (1/4) of the net profit realized from operations on the
Hogg-Japhet Lease.” Regarding Lyle and Warbonnet, the trial court found:
5. Defendant Kenneth R. Lyle is one of the successors in interest of
[Humble Oil] and is bound by the 1919 Assignment. Defendant
Warbonnet is not a successor in interest of [Humble Oil] and is not
bound by the 1919 Assignment, and no liability is assessed against
Warbonnet. Defendant Warbonnet is a “contract operator” pursuant to
a written operating agreement among the working interest owners.
 
6. Defendant Lyle is required under the 1919 Assignment to account to
the Plaintiffs, during each of the Plaintiffs’ respective ownership
periods, for his proportional share (17.125%) of the carried working
interest of one-fourth (1/4) of the net money profit realized from
operations conducted on the Hogg-Japhet Lease, from and after four
years prior to the filing of this suit.
 
The trial court signed an order for interlocutory appeal of the partial summary
judgment pursuant to Texas Civil Practice and Remedies Code section 51.0014(d),



and this appeal followed.
DISCUSSION
Standard of Review
          We review a trial court’s grant or denial of summary judgment de novo. 
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003). To
prevail on a traditional summary judgment motion, the movant has the burden of
proving that it is entitled to judgment as a matter of law and that there are no genuine
issues of material fact. Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339,
341 (Tex. 1995). A defendant who negates at least one essential element of the cause
of action or establishes all of the elements of an affirmative defense is entitled to
summary judgment. Cathey, 900 S.W.2d at 341. When both parties move for
summary judgment and the trial court grants one motion and denies the other, the
reviewing court should review the summary judgment evidence presented by both
sides, determine all questions presented and render the judgment that the trial court
should have rendered. Tex. Workers’ Comp. Comm’n v. Patient Advocates, 136
S.W.3d 643, 648 (Tex. 2004).
Lyle’s Obligations Under the 1919 Assignment
          In his first four issues, Lyle argues that the trial court erred in granting the
Japhet heirs’ summary judgment motion and denying his own because he is not
subject to the provisions in the 1919 Assignment. In his first issue, Lyle argues that
the trial court erred in holding that he was obligated to account to each of the Japhet
heirs during their respective ownership periods for his proportional share of the
carried working interest of one-fourth of the net money profit realized from
operations conducted on the Hogg-Japhet Lease. In his second issue, Lyle argues that
the “working interest of one-fourth (1/4) of the net money profit realized” was a
production payment or oil payment, which was fully paid and discharged prior to his
acquisition of the lease. In his third issue, Lyle argues that no interest was reserved
to Dan A. Japhet in the 1919 Assignment and that his “assignments were only subject
to the agreement of February 20, 1919, as amended, not the assignment itself.” In his
fourth issue, Lyle argues that he is not obligated to account to the Japhet heirs
because they are strangers to him, because they have no title, and because he has
superior title to his leasehold interest. In his fifth issue, Lyle argues that the Japhet
heirs have no record interest in the lease.



          The Japhet heirs claim that Dan A. Japhet reserved a one-fourth net profit
interest in the lease in the 1919 Assignment and that Lyle is bound by the 1919
Assignment’s covenants.
A.      Interpretation of the 1919 Assignment
          “[T]he general rule in oil and gas law [is] that controversies regarding assignors
and assignees are governed by the construction and interpretation of the provisions
of the assignment itself and the collateral contracts of the parties.” EOG Res., Inc. v.
Hanson Prod. Co., 94 S.W.3d 697, 702 (Tex. App.—San Antonio 2002, no pet.). If
a contract is unambiguous, a court must enforce the contract as written. Heritage
Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996); see EOG Res., 94
S.W.3d at 701 (“The interpretation of an unambiguous contract is a question of law
and we are not required to defer to any interpretation afforded by the trial court.”)
(citing MCI Telecomm. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650 (Tex.
1999)). Whether a contract is ambiguous is itself a question of law. Id. The
instrument alone will usually be deemed to express the intention of the parties, for it
is the objective and not the subjective intent that controls. Sun Oil Co. v. Madeley,
626 S.W.2d 726, 731 (Tex. 1981). When an instrument is not ambiguous on its face,
extrinsic evidence may not be used to create ambiguity. Balandran v. Safeco Ins. Co.,
972 S.W.2d 738, 745 (Tex. 1998).
          Here, the 1919 Assignment, by its plain language, conveyed the lease from Dan
A. Japhet et al. to Humble Oil. Humble Oil paid $200,000 for the lease, the receipt
of which Dan A. Japhet and the other assignors acknowledged in the assignment. 
Humble Oil received all of the assignors’ “right, title and interest . . . subject to . . .
the royalties herein reserved to assignors.” The parties then set out the specific terms
of the royalty and the method by which it would be calculated, providing that Humble
Oil agreed “to carry [Dan A. Japhet et al.] for a working interest of one-fourth (1/4)
of the net money profit realized by it from its operations” on the lease. The parties
to the 1919 Assignment further agreed that “accountings [would] be had monthly
once profits begin to accrue” and that “all the conditions and terms hereof shall
extend to the heirs, executors, legal representatives, successors and assigns of the
parties hereto.”
          Lyle argues that the interest created by the 1919 Assignment is a “carried
interest” or “net profit interest,” not a royalty, and that the Japhet heirs do not have
a present property interest in the lease. Lyle does not define “net profit interest,” but
he argues that “[i]t is customary for a carried interest arrangement to cease when all
costs as to the carried party are satisfied” and that “[t]he carry in the Japhet/Humble
Assignment would end when the total consideration of $200,000 was paid out of
future production, which occurred in 1928.” However, these arguments are refuted,
as a matter of law, by the plain meaning of the 1919 Assignment.
          A royalty is a “share of the product or profit reserved by the owner for
permitting another to use the property. In its broadest aspect royalty is a share of
profit reserved by the owner for permitting another the use of the property.” Alamo
Nat’l Bank v. Hurd, 485 S.W.2d 335, 338 (Tex. Civ. App.—San Antonio 1972, writ
ref’d n.r.e.) (citing Griffith v. Taylor, 291 S.W.2d 673, 676 (Tex. 1956)). In the oil
and gas industry,
Royalty . . . is commonly understood to be that part or share of
production reserved or to be paid during the life of the lease; and
generally speaking, the royalty created, excepted, or reserved under the
terms of an oil and gas lease, is the right to receive, either in kind or its
equivalent in money, a stipulated fraction of the oil or gas produced and
saved from property covered by the lease, free of all costs of
development and production.
 
Id. “A royalty interest derives from the grantor’s mineral interest and is a
nonpossessory interest in minerals that may be separately alienated,” and “[t]he
interest conveyed or reserved is to be determined from all of the provisions of the
instrument.” Hamilton v. Morris Res., Ltd., 225 S.W.3d 336, 344 (Tex. App.—San
Antonio 2007, pet. denied) (quoting Temple-Inland Forest Prod. v. Henderson
Family P’ship, Ltd., 958 S.W.2d 183, 186 (Tex. 1997)).
          The 1919 Assignment expressly states that the assignment to Humble Oil is
subject to “the royalties herein reserved to assignors.” The 1919 Assignment
provided that the royalty would be one-fourth of the profit realized. This is clearly
a reservation of “the right to receive . . . a stipulated fraction of the oil or gas
produced and saved from the property . . . free of all costs of development and
production.” See id. Furthermore, the 1919 Assignment expressly states that receipt
of the full $200,000 was acknowledged by Dan A. Japhet and the other assignors at
the time they executed the assignment, and the parties did not provide any indication
that the interest was to terminate when a certain quantity of production or amount of
profit was realized.
          The royalty interest is also, as a matter of law, a property interest. “It is well-settled that a royalty interest in an oil and gas lease is an interest in real property, held
to have the same attributes as real property.” Kelly Oil Co. v. Svetlik, 975 S.W.2d
762, 764 (Tex. App.—Corpus Christi 1998, pet. denied) (citing Garza v. DeMontalvo,
217 S.W.2d 988, 992 (Tex. 1949)). The right to receive royalty payments is one of
the five attributes comprising a severed mineral estate and is a “separate, distinct
property interest that may be conveyed or reserved in connection with a conveyance
of a mineral interest.” Hamilton, 225 S.W.3d at 344.
          Lyle also argues that the one-fourth royalty interest was a “production
payment” or “oil payment.” An “oil payment” is another term for a “production
payment” and is “a share of the oil produced from the described premises, free of
costs of production, terminating when a given volume of production has been paid
over, or when a specified sum from the sale of such oil has been realized.” Alamo
Nat’l Bank, 485 S.W.2d at 340. An oil payment is limited in duration. See id. at
338–39 (“‘Overriding royalties,’ ‘oil payments,’ and ‘production payments’ are terms
usually referring to an interest carved out of the lessee’s or operator’s interest, in
addition to the lessor’s royalty. An overriding royalty is an interest running
throughout the term of the lease, while an oil payment or production payment is an
interest running only until it has yielded a specified sum of money.”). This is not the
type of arrangement contemplated in the 1919 Assignment, which, by its plain and
unambiguous language, provided for Humble Oil to purchase all of the interest in the
lease for $200,000 paid at the time the agreement was made, with the reservation of
a one-fourth royalty interest in the net profits.
          Furthermore, Lyle’s argument that his “assignments were only subject to the
agreement of February 20, 1919, as amended, not the assignment itself” is not
supported by the plain language of the 1919 Assignment and the collateral agreement
of the parties entered on the same day. The collateral agreement conveyed the stored
oil on the lease to Humble Oil in exchange for $20,000 paid to Dan A. Japhet et al.
and conveyed other personal property on the lease to Humble Oil as part of the
assignment of the lease in return for the $200,000 the assignors had already received. 
Nothing in the language of the collateral agreement can be construed as changing the
terms set out in the 1919 Assignment.



          We conclude that the 1919 Assignment reserved for Dan A. Japhet 52/60 of the
one-fourth royalty interest in the profits realized from Humble Oil’s operations on the
lease and obligated Humble Oil to provide monthly accountings to Dan A. Japhet. 
We next consider whether the 1919 Assignment is binding on Lyle and obligates him
to provide an accounting and make payments to the Japhet heirs.
 
B.      1919 Assignment’s Effect on Lyle
          “[A] purchaser is bound by every recital, reference and reservation contained
in or fairly disclosed by any instrument which forms an essential link in the chain of
title under which he claims.” Westland Oil Dev. Corp. v. Gulf Oil Corp., 637 S.W.2d
903, 908 (Tex. 1982). As stated in Westland Oil,
The rationale of the rule is that any description, recital of fact, or
reference to other documents puts the purchaser upon inquiry, and he is
bound to follow up this inquiry, step by step, from one discovery to
another and from one instrument to another, until the whole series of
title deeds is exhausted and a complete knowledge of all the matters
referred to and affecting the estate is obtained.
 
Id. (quoting Loomis v. Cobb, 159 S.W. 305, 307 (Tex. Civ. App.—El Paso 1913, writ
ref’d)).



          The 1991 assignment from Hablinski to Lyle clearly stated that the lease was
“subject to . . . an agreement dated February 20, 1919, as amended, between Humble
Oil and Refining Company and Dan A. Japhet, et al.,” as did every other assignment
of the lease between 1969 and 1991. The 1919 Assignment itself was recorded in the
Brazoria County property records and contained the specific details of the interests
reserved by Dan A. Japhet and the other assignors when they conveyed the lease to
Humble Oil. Therefore, Lyle had notice of the 1919 Assignment and the covenants
it contained. See id.
          Furthermore, Lyle is bound by the covenants recited in the 1919 Assignment
as a matter of law because they are covenants that run with the land. “In order for the
covenant to run with the land there must be privity of estate between the parties to the
agreement. This means there must be a mutual or successive relationship to the same
rights of property.” Westland Oil, 637 S.W.2d at 910–11. The covenant must also
“touch and concern” the land. Id. at 911. “If the promisor’s legal relations in respect
to the land in question are lessened—his legal interest as owner rendered less
valuable by the promise—the burden of the covenant touches or concerns that land.” 
Id. (quoting Bigelow, The Content of Covenants in Leases, 12 Mich. L. Rev. 639
(1914), and Williams, Restrictions on the Use of Land: Covenants Running with the
Land at Law, 27 Tex. L. Rev. 419 (1949)). Here, Lyle, as the most recent assignee
of the lease, has a “successive relationship to the same rights of property” as Humble
Oil, and the Japhet heirs, as inheritors of Dan A. Japhet’s interests, have a successive
relationship to the same property rights as Dan A. Japhet. See id. The covenant to
pay a one-fourth royalty also clearly touches and concerns the land as it affects the
value of the lease. See id. Therefore, Lyle is bound by the covenants recited in the
1919 Assignment.
C.      The Japhet Heirs’ Chain of Title
          Lyle argues that the Japhet heirs “have failed to demonstrate record chain of
title, much less superior title to [his] interest, [which] is verifiable through a clear
chain of recorded Assignments.” He further argues that the Japhet heirs rely on
“unrecorded documents, out-of-county probates and other matters not filed in
Brazoria County” in their attempt to assert a claim of title. The Japhet heirs argue
that they “are the present owners of the rights vested in Dan A. Japhet by the 1919
Assignment” and that “[t]he summary judgment evidence contains a complete chain
of title from Dan A. Japhet through his will to his three sons . . . and their estates.”
          Lyle’s argument is unavailing. As we have already discussed, the 1919
Assignment unambiguously and by its plain language reserved a royalty interest to
Dan A. Japhet, and Lyle, as a successor to Humble Oil, is bound by Humble Oil’s
covenants to account for and pay the royalty interest. The 1919 Assignment was
recorded in the Brazoria County Property records. The Japhet heirs had only to
demonstrate to the trial court that, as a matter of law, they had inherited Dan A.
Japhet’s right to the royalty interest. The Japhet heirs filed an abstract of title,
totaling 185 pages, including the appendix and various supporting assignments,
deeds, and probate instruments that reflect the transfer of the interest from Dan A.
Japhet’s estate to his sons and then to the present heirs. On appeal, Lyle argues that
the Japhet heirs’ summary judgment is inadmissible “on grounds of incompetence,
conclusory, not the best evidence, self-serving, speculative, hearsay, unauthenticated,
[and] failure to lay predicate.” However, Lyle fails to point to specific parts of the
185-page abstract of title that demonstrate the errors he alleges or to advance any
argument beyond a mere list of alleged deficiencies. Therefore, his complaints
regarding the summary judgment evidence submitted by the Japhet heirs to
demonstrate their chain of title are waived for failure to adequately brief them. See
Tex. R. App. P. 38.1(i).
          We also conclude that Lyle’s argument that he has “superior” title to the
leasehold is unsuccessful. The Japhet heirs claim only their proportionate shares of
the one-fourth royalty interest reserved to Dan A. Japhet in the 1919
Assignment—not any of the other interests in the mineral estate. See Hamilton, 225
S.W.3d at 344 (“A severed mineral estate is comprised of five attributes: (1) the right
to develop (the right to ingress and egress), (2) the right to lease (the executive right),
(3) the right to receive bonus payments, (4) the right to receive delay rentals, and (5)
the right to receive royalty payments.”). The assignment under which Lyle received
his interest clearly stated that it was subject to the royalty interest reserved in the
1919 Assignment, so, as a matter of law, Lyle does not have “superior title” to that
royalty interest. See id. (“A conveyance of a mineral estate need not dispose of all
interests; individual interests can be held back, or reserved, in the grantor. . . . The
interest conveyed or reserved is to be determined from all the provisions of the
instrument.”).
          We conclude that the trial court did not err in holding, as a matter of law, that
Lyle is bound by the 1919 Assignment and is obligated to account for and pay the
Japhet heirs for their shares of the one-fourth royalty interest in his portion of the
lease. Tex. R. Civ. P. 166a(c); Tex. Workers’ Comp. Comm’n, 136 S.W.3d at 648;
Cathey, 900 S.W.2d at 341.
          We overrule Lyle’s first, second, third, fourth, and fifth issues.
Affirmative Defenses
          In his sixth issue, Lyle argues that the trial court erred in denying his motion
for summary judgment because the Japhet heirs’ claims are barred by the statute of
limitations, laches, and the statute of frauds.



 
A.      Statute of Limitations
          Lyle argues that the Japhet heirs’ claim is barred by the statute of limitations. 
Lyle correctly points out that both a breach of contract claim and a claim for specific
performance of a contract for conveyance of real property have a four-year statute of
limitations.


 See Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a) (Vernon 2002); see
also Headington Oil Co. v. White, 287 S.W.3d 204, 214 (Tex. App.—Houston [14th
Dist.] 2009, no pet.) (“The statute of limitations for the recovery of royalty payments
is four years.”). However, “[i]f the parties’ agreement contemplates a continuing
contract for performance, the limitations period does not usually commence until the
contract is fully performed.” Davis Apparel v. Gale-Sobel, a Div. of Angelica Corp.,
117 S.W.3d 15, 18 (Tex. App.—Eastland 2003, no pet.) (citing Intermedics, Inc. v.
Grady, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref’d n.r.e.)). 
Furthermore, “if the terms of an agreement call for periodic payments during the
course of the contract, a cause of action for such payments may arise at the end of
each period, before the contract is completed.” Intermedics, 683 S.W.2d at 845. 
Therefore, the statute of limitations here, where the 1919 Assignment contemplated
a monthly accounting and payment for the one-fourth royalty, only bars recovery of
the royalty payments accruing more than four years prior to the filing of the suit. See
id.; see also Headington Oil Co., 287 S.W.3d at 214 (holding that statute of
limitations barred royalty owner’s claims against oil lease operator for events more
than four years prior to filing of suit); Dvorken v. Lone Star Indus., Inc., 740 S.W.2d
565, 567 (Tex. App.—Fort Worth 1987, no writ) (“If a continuing breach has
occurred then appellants would be entitled to damages from four years prior to the
filing of their original petition. . . .”). The trial court’s order held that Lyle is required
under the 1919 Assignment to account to the Plaintiffs for the one-fourth royalty
interest “from and after four years prior to the filing of this suit.”
          Therefore, we conclude that the Japhet heirs’ claims are not barred by the
statute of limitations.
B.      Laches
          Lyle also argues that the Japhet heirs’ claims are barred by laches. Specifically,
he argues that the royalty interest in the net profits had not been paid to the Japhets
in over sixty years. 
          “Two essential elements of laches are (1) unreasonable delay by one having
legal or equitable rights in asserting them; and (2) a good faith change of position by
another to his detriment because of the delay.” In re Jindal Saw Ltd., 264 S.W.3d
755, 760 (Tex. App.—Houston [1st Dist.] 2008, orig. proceeding). (quoting Rogers
v. Ricane Enters., 772 S.W.2d 76, 80 (Tex. 1989)). “As a general rule, laches is
inappropriate when the controversy is one to which a statute of limitations applies.” 
Graves v. Diehl, 958 S.W.2d 468, 473 (Tex. App.—Houston [14th Dist.] 1997, no
pet.). Here, Lyle has presented no evidence or argument that laches should apply to
the Japhet heirs’ claims to recover the royalty interest or that he made “a good faith
change of position” to his detriment because of the delay.
          Therefore, Lyle failed to establish as a matter of law that the Japhet heirs’
claims are barred by laches.
C.      Statute of Frauds
          Lyle also argues that the Japhet heirs’ claims are barred by the statute of frauds. 
The statute of frauds requires that certain agreements be in writing and that they be
signed by the person to be charged with the promise or agreement to be enforceable. 
See Tex. Bus. & Com. Code Ann. § 26.01 (Vernon 2009). Agreements to assign an
interest in an oil and gas leasehold estate are subject to the requirements of the statute
of frauds. Westland Oil, 637 S.W.2d at 908. As we have already discussed, the 1919
Assignment was in writing and was signed by all of the parties involved in that
transfer of the lease. Lyle subsequently signed the 1991 assignment in which
Hablinski transferred a portion of that lease to him with the express statement that the
assignment was made subject to the 1919 Assignment. This satisfies the statute of
frauds.
          We conclude that the Japhet heirs’ claims are not barred by the statute of
frauds.
          We overrule Lyle’s sixth issue.
Alternative Ground for Reversal
          Alternatively, in his seventh issue, Lyle argues that he presented evidence that
raised genuine issues of material fact as to the proper construction of the assignment,
payment, and discharge and satisfaction, and on his defenses of extinguishment of the
production payment, laches, statute of limitations, and waiver. However, Lyle does
not present any analysis or citation to authority for this issue beyond the arguments
he presented on his first six issues.
          As we have already held in analyzing his previous six issues, the Japhet heirs’
rights were determined as a matter of law based on the 1919 Assignment between
Humble Oil and Dan A. Japhet and the subsequent assignments of the Hogg-Japhet
lease. See Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341 (Tex.
1995) (holding movant is entitled to summary judgment when it proves that it is
entitled to judgment as a matter of law). To the extent that Lyle is attempting to raise
new arguments in his seventh issue, they are waived for failure to adequately brief. 
See Tex. R. App. P. 38.1(i).
          We overrule Lyle’s seventh issue.
CONCLUSION
          We affirm the judgment of the trial court.





                                                             Evelyn V. Keyes
                                                             Justice

Panel consists of Justices Keyes, Sharp, and Massengale.